**IN THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:23-cr-00031-1 |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION DENYING MOTION FOR RELEASE PENDING APPEAL** |
| LUELLA RICHELLE ABAT JAO, | |
| Defendant. | |

This matter came before the Court on Defendant Luella Richelle Abat Jao's ("Luella") Motion for Release Pending Appeal (ECF No. 110). The United States filed an Opposition. (ECF No. 118.) At the hearing held on October 22, 2024, after reviewing Luella's Motion, authorities, and hearing oral argument, the Court DENIED Luella's Motion for the reasons stated on the record. The Court details its reasoning in denying Luella's Motion herein.

## I.     BACKGROUND

### A. Procedural Background

On November 15, 2023, the Grand Jury returned an Indictment, charging Defendants Luella, Joshua Hans Abat Jao ("Joshua"), and Saori Oki Jao ("Saori") with Conspiracy to Use Means of Identification in Furtherance of Fraud in violation of 18 U.S.C. §§ 1028(a)(7) and 1028(f). (Indictment, ECF No. 1.) After Chief Judge Frances M. Tydingco-Gatewood disqualified herself, I,

1

the undersigned judge, was designated on November 22, 2023, to preside over the case. (Order, ECF No. 2; Designation Order, ECF No. 9.)

On June 3, 2024, an Information charged Joshua and Saori only with the misdemeanor offense of Conspiracy to Use Means of Identification in Furtherance of Fraud in violation of 18 U.S.C. §§ 1028(a)(7), 1028(f), and 1028(b)(6). (Information, ECF No. 40.)

All three Defendants who were represented by private counsel consented to proceed with a change of plea before Magistrate Judge Michael J. Bordallo. (Luella Consent, ECF No. 36; Joshua Consent, ECF No. 44; Saori Consent, ECF No. 47.) Saori and Joshua appeared before Judge Bordallo and plead guilty to the Information (Joshua COP Mins., ECF No. 41; Saori COP Mins., ECF No. 49) while Luella also appearing before Judge Bordallo plead guilty to the Indictment. (Luella COP Mins., ECF No. 35.) Subsequently, Judge Bordallo issued his Reports and Recommendations as to all three Defendants recommending that I accept Defendants guilty pleas and adjudge them as guilty. (Luella R&R, ECF No. 38; Joshua R&R, ECF No. 42; Saori R&R, ECF No. 51.) Neither the Government nor any of the Defendants made any objections to their respective Report and Recommendation, and so I adopted each Defendant's Report and Recommendation and found that there is a factual basis for each of their pleas and that the pleas were entered into knowingly and voluntarily. (Joshua Order Adopting R&R, ECF No. 53; Saori Order Adopting R&R, ECF No. 54; Luella Order Adopting R&R, ECF No. 48.)

**B. Luella and Co-Conspirators' Plea Agreements**

In Luella, Joshua, and Saori's Plea Agreements, the Defendants understood the Court's role at the plea and sentencing procedure:

> The Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by the Defendant; that the Court will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in the Plea Agreement. . . . The Defendant understands that the Court is required to consider

2

the applicable sentencing guideline range, but may depart upward or downward under the appropriate circumstances.

(Joshua Am. Plea Agreement ¶ 2, ECF No. 45; Saori Am. Plea Agreement ¶ 2, ECF No. 50; Luella Am. Plea Agreement ¶ 2, ECF No. 37.) Nor is the Court a party to their plea agreements. (Joshua Am. Plea Agreement ¶ 2; Saori Am. Plea Agreement ¶ 2; Luella Am. Plea Agreement ¶ 2.)

Each Defendant, including Luella, stipulated and agreed to the factual basis for the charge they plead guilty to in their respective Plea Agreements. According to her Plea Agreement, Luella conspired with her son Joshua, and daughter-in-law Saori, to defraud Alupang Beach Club ("ABC") by obtaining fraudulent commission payments over a period of several years beginning at least by January 2015 and continuing until at least April 2019. (Luella Am. Plea Agreement ¶ 5.) Luella worked as a Reservations Manager and Saori was a Reservation Agent. (*Id.*) Saori joined the conspiracy later than Luella and Joshua when she started working at ABC in July 2016. (Saori Am. Plea Agreement ¶ 4(a).)

ABC is a marine sports tour company where customers can book tours and activities through ABC's website, over the phone, in-person, or using Independent Sales Agents ("ISAs"). (Luella Am. Plea Agreement ¶ 5.) ISAs received commissions from ABC in the form of a percentage of the total spent by customers that booked through the ISA. (*Id.*) ABC paid commissions to ISAs in cash. (*Id.*) Bookings made by ISAs included a notation with the referring agent's name, and for the ISA to collect their commissions they were required to go to the ABC office in person, show a photo ID, and sign a receipt acknowledging cash received. (*Id.*)

"In situations where customers booked tours or activities with ABC using the website, over the phone, or in-person, [Luella] and Saori would use their knowledge of and access to ABC's computer reservation system to add Joshua **or another ISA as the referring agent.**" (*Id.* (emphasis added).) For cases in which Joshua was the named referring agent, an ABC cashier would pay him out in cash. (*Id.*) The payments totaled $17,000 where Joshua was fraudulently named as the

3

referring agent. (*Id.*) "In cases where [Luella] and Saori **fraudulently entered another ISA's name as the referring agent**, a photocopy of the ISA's identification was used, which included Guam driver's licenses, United States Passports, and other identification documents, the ISA's signature was forged, and a false cash receipt was created for the commission." (*Id.*) "Then, [Luella], Saori, and Joshua would share the cash proceeds." (*Id.*)

In Luella and her Co-Conspirators' amended plea agreements, the United States and Defendants stipulated that the fraud loss amount was greater than $15,000 but less than $40,000 as a result of the criminal activity jointly undertaken by Defendants. (*Id.* ¶ 8(a).) Because of this loss amount, the United States and the Defendants stipulated that the base offense level was increased by an additional four levels. (*Id.* (citing U.S.S.G. § 2B1.1(b)(1)(C)).)

**C. Luella's Draft Presentence Investigation Report and Objections**

On July 23, 2024, the U.S. Probation Officer filed his Draft Presentence Investigation Reports ("PSR") as to Luella, Joshua, and Saori. (Luella Draft PSR, ECF No. 55; Joshua Draft PSR, ECF No. 56; Saori Draft PSR, ECF No. 57.) Luella's Draft PSR states: "In situations where customers booked tours or activities with ABC using the website, over the phone, or in-person, Luella and Saori would use their knowledge and access to ABC's computer reservation system to add Joshua or **another ISA as the referring agent.**" (Luella Draft PSR ¶ 15 (emphasis added).) "In situations where Luella or Saori fraudulently entered another ISA's name as the referring agent, a photocopy of the ISA's identification was used, which included Guam driver's licenses, United States passports, and other identification documents." (*Id.* ¶ 17.) Additionally, "the ISA's signature was forged, and a false cash receipt was created for the commission." (*Id.*) After Defendants created the fraudulent commission and it was paid out, Defendants would share the cash proceeds. (*Id.* ¶ 18.)

Luella and Co-Conspirators' Draft PSRs continue to describe how the conspiracy functioned. After Luella and Saori would receive an ABC direct reservation from a customer—which ABC was

not to pay a commission for—Luella and Saori would enter the direct reservation into the ABC's computer system with incomplete and incorrect information. (*Id.* ¶ 22.) Luella and Saori would then falsely certify the reservation to be from an ISA, and subsequently pay out the 20-25% in commission to themselves. (*Id.*)

ABC, the victim in this case, conducted its own investigation into Defendant's fraudulent scheme starting in 2017. (*Id.* ¶¶ 23-27.) In particular, ABC reviewed a customer purchase of seventeen reservations from Fukui Shunta Group. (*Id.* ¶ 28.) Saori entered the reservation on the ABC computer system on January 7, 2019, and the ISA was inputted as unknown. (*Id.*) ABC surveillance video shows that Luella and Saori look through a binder full of identifications of ISAs to see whose identity they could steal. (*Id.*) Luella and Saori chose to use ISA Abigail Ramos Sahagun ("Sahagun"), which is demonstrated by Luella and Saori pulling out Sahagun's identification and practicing Sahagun's signature in order to forge the signature to receive the commission. (*Id.*) The receipt voucher was left in the reservation's office overnight and on January 8, 2019, the day after Fukui Shunta Group made their reservation, Luella changed the ISA from unknown to Sahagun. (*Id.*) Luella later changed the ISA from Sahagun to Joshua. (*Id.*) Surveillance video revealed Saori took cash to pay Joshua the commission while Luella watched and approved the payout of the commission. (*Id.*)

Joshua's claimed commissions ("Joshua Commissions") from ABC were included in all three Defendants' Draft PSRs. (Luella Draft PSR ¶ 29; Saori Draft PSR ¶ 31; Joshua Draft PSR ¶ 31.) Additionally, commission amounts with forged signatures ("Forged Signature Commissions") were detailed in the span of almost 200 pages of the report as having been made by Luella and/or Saori and were included in Luella and Saori's Draft PSRs but with no total amount. (Luella Draft PSR ¶ 30; Saori Draft PSR ¶ 32.) There was no Forged Signature Commissions paragraph in Joshua's Draft PSR. In calculating Defendants' sentencing guidelines, Defendants' Draft PSRs

included a specific offense characteristic for a loss of $16,946.50, which increased their offense levels by four. (Luella Draft PSR ¶ 37; Saori Draft PSR ¶ 39; Joshua Draft PSR ¶ 38.)

In response to the Draft PSR, Luella objected that she was entitled to the zero-point offender adjustment under U.S.S.G. § 4C1.1(a) and therefore her total offense level should be decreased by two levels. (Luella Objection Draft PSR, ECF No. 58.) Joshua made the same objection as Luella. (Joshua Objection Draft PSR, ECF No. 59.) Luella subsequently filed a Supplemental Objection in which she objected to the spelling of her sister's name and ages of her children. (Suppl. Objections, ECF No. 61.) Saori made no objections, and the United States adopted the findings of all three Defendants' Draft PSRs. (United States' Response Draft PSRs, ECF No. 60.)

The U.S. Probation Officer then filed Defendants' Final PSRs in August 2024. (Luella Final PSR, ECF No. 62; Saori Final PSR, ECF No. 63; Joshua Final PSR, ECF No. 64.) The Probation Officer maintained his position that Luella was not entitled to the zero-point offender adjustment because of her aggravating role in the offense (Addendum Luella Final PSR 1, ECF No. 62-1).[1] The Probation Officer did amend Saori and Joshua's Draft PSRs to reflect a two-level decrease in their offense levels as he found that they were entitled to the reduction as zero-point offenders. (Saori Addendum Final PSR 1, ECF No. 63-1; Joshua Addendum Final PSR 1, ECF No. 64-1.)

**D. Status Conference on Bifurcation**

In preparation for Defendants' sentencing, I reviewed Defendants' Final PSRs. Because Defendants' Final PSRs did not include a total amount for victim's losses, and in particular, for purposes of restitution, I noticed the case for a Status Conference with the parties. (*See* Notice, ECF No. 65.) At the Status Conference, I indicated that although Joshua's Commission's were totaled at $16,946.50, there was no total for the Forged Signature Commissions that was about 200 pages in

---

[1] The U.S. Probation Officer made the other changes identified in Luella's Supplemental Objections. (Addendum Luella Final PSR 1.)

6

Saori and Luella's Final PSRs. As such, I inquired whether there were objections to bifurcating Defendants' restitution from sentencing. No party objected to bifurcating restitution from sentencing. (Virtual Mins., ECF No. 66.) I also granted Defendants' oral motions for an extension to file their sentencing memorandum. (*Id.*) The next day, I issued the Order Bifurcating Sentencing and Restitution Hearing noting that "[b]ased upon the response from the victim and that no total amount has been ascertained by the U.S. Probation Officer as to the victim's losses, the Court hereby bifurcates the sentencing hearing and the final determination of the victim's losses." (ECF No. 67.)

Defendants subsequently filed their sentencing memorandum and again, Luella and Saori did not object to the inclusion of the Forged Signatures in their Final PSRs. (Saori Sentencing Mem., ECF No. 72; Luella Sentencing Mem., ECF No. 71.)

**E. Initial Sentencing Hearing on September 6, 2024**

The Court was still not provided a total of the Forged Signature Commissions list that was included in Saori and Luella's Final PSRs the day before sentencing. Application of the specific offense characteristics of U.S.S.G. § 2B1.1(b)(1), which is the applicable guideline for Defendants' convictions, requires a loss calculation. As such, I contacted the U.S. Probation Officer and requested the total amount for the Forged Signature Commissions contained in both Luella and Saori's Final PSRs. The Probation Officer provided me a total amount for the Forged Signature Commissions and sent a copy of the spreadsheet containing the total amount to Defendants' counsel and the United States. (Tr. 12-13, ECF No. 112.) No new information was contained in the spreadsheet shared with me and the parties except for the total amount. (*Id.* at 13.)

At the beginning of the sentencing hearing on September 6, 2024, I inquired whether there were any amendments to be made to the Defendants' Final PSRs, which the Probation Officer informed the Court that he would like to amend each of their Final PSRs. (*Id.* at 9-10.) The Probation Officer orally amended Joshua's PSR to include the Forged Signature Commissions that were

originally included in Saori and Luella's Final PSRs. (*Id.* at 26-27.) Additionally, the Probation Officer amended all three Defendants' PSRs, including Luella's, to include a total for Joshua's Commissions and the Forged Signature Commissions in the loss amount calculation. (*Id.* at 18-20.) The Probation Officer determined that the total amount for the Forged Signature Commissions, which was included in Saori and Luella's Draft and Final PSRs, was $225,989.60. (*Id.* at 19.) The Probation Officer combined this total with Joshua's Commissions, to determine that the total loss amount for Defendants' specific offense characteristics under U.S.S.G. § 2B1.1(b)(1) came to $242,936.10. (*Id.* at 15.) Therefore, the Probation Officer requested to amend Defendants' Final PSRs to reflect the total for Joshua's Commissions, the total for the Forged Signature Commissions, and the resulting changes to Defendants' guidelines calculations. (*Id.* at 13-29.)

Luella's counsel Mr. Razzano inquired "how this loss calculation was changed after work hours last night" and wanted "the record to reflect that we didn't have the new information and had no ability to object to the new information or file any briefs regarding the new information that we just received today." (*Id.* at 36, 40.) The Court then clarified, asking if the new information was the total to Luella's Final PSR in paragraph thirty, and Attorney Razzano confirmed that the new information was the total of the Forged Signature Commissions. (*Id.* at 40.) Attorney Razzano "move[d] to continue the sentencing . . . in order so we can get an amended presentence report with the new information and file the appropriate motions. And I would also like to have an evidentiary hearing and I would like to cross-examine the probation officer to determine how this came about." (*Id.* at 41.) The Court informed Attorney Razzano that the Court asked the Probation Officer for the total loss and pointed out that at the Status Conference, there was no total to which no party responded. (*Id.*) Attorney Razzano relayed that he did not recall that and that it was not on the record. (*Id.* at 45.)

8

Attorney Razzano proceeded to characterize the investigation that occurred regarding the Defendants' fraud. "[Y]ou know, this is not a case where the FBI came in and did an investigation. Okay? Where we could rely on federal officers. . . . See, you don't know this, but you are looking at a set of facts that were not investigated." (*Id.* at 46.) "[D]id anyone independently verify it? Was that done by probation? Was that done by an FBI agent? Was that done by anyone? No. The answer is, no." (*Id.* at 48.)

Thereafter, Defendants' attorneys requested to speak with their clients to determine if they wished to withdraw their guilty pleas. (*Id.* at 48-49.) Attorney Razzano moved the Court to disqualify Guam's Probation Officers because they are under the purview of Chief Judge Frances Tydingco-Gatewood and "what went on today in the courtroom." (*Id.* at 50.) After a recess for Defendants' attorneys to advise their clients, Attorney Razzano requested a two-week continuance. (*Id.* at 52-53.) The Court denied Attorney Razzano's motion to disqualify Guam's U.S. Probation Officer without prejudice. (*Id.* at 55.) Then, the United States informed the Court and Defendants that because of its contractual obligation under the plea agreements, the government would not try to prove a higher amount than that originally stipulated to for loss. (*Id.* at 56.)

Attorney Razzano requested "can we get a clean copy of the final presentence report?" (*Id.* at 60.) Attorney Razzano also asserted that in Defendants' plea agreements, nobody plead guilty to the offense conduct regarding the Forged Signature Commissions. (*Id.* at 62.) "The guilty plea only surrounds the transactions involving Joshua." (*Id.*)

Because of Attorney Razzano's two request, the Court ordered that the first amended PSR for each Defendant be filed by 3:00 p.m. the next day, September 7, 2024, and any objections by Defendants were due on September 13, 2024. (*Id.* at 68-69.) The Court denied Luella's motion to withdraw her guilty plea without prejudice. (*Id.* at 71.) Defendants were given a deadline to file a

9

written motion if they wished to withdraw their plea, but no Defendant filed such motion. (*See id.* at 72.)

**F. Luella's Objections to her Final Amended PSR**

The Probation Officer timely filed Defendants' Amended Final PSRs on September 7, 2024. (Luella Am. Final PSR, ECF No. 76; Joshua Am. Final PSR, ECF No. 77; Saori Am. Final PSR, ECF No. 78.) Luella and Joshua both made objections to their Amended Final PSRs. (Luella Objections Am. Final PSR, ECF No. 79; Joshua Objections Am. Final PSR, ECF No. 80.) Specifically, Luella stated "Defendant's Amended Plea Agreement admits guilt only to conduct involving Joshua Jao. See ECF 37 at Paragraph 29. The United States agreed. *Id*. There is no other conduct in this case." (Luella Objections Am. Final PSR 2.) Further, Luella argued that "no independent verification of the conduct in Paragraph 30 was ever conducted. . . . Defendant did not and will not plea to this conduct. See ECF 37 at Paragraph 5." (*Id.*)

**G. Continued Sentencing Hearing on September 18-19, 2024**

At the continued sentencing hearing, the Court was mindful of the United States' role and that it is bound to its plea agreements with Defendants. For this reason, it stated that there was Ninth Circuit case law that permits the Court to query into evidence relevant for purposes of sentencing and question parties. (*Id.* at 81-82.) The Court began the sentencing on September 18, 2024, by inquiring into the objections by the Defendants. (*Id.* at 89.) Luella, through her counsel, denied any involvement in the Forged Signature Commissions matters, and Attorney Razzano stated "[s]he denies that she was a part of that and I don't think it could be proven so I guess that's why we're here today to see if there's a way to prove that conduct." (*Id.* at 90.) Joshua, through his counsel, also objected stating he was not involved in the Forged Signature Commissions and never received those commissions. (*Id.* at 91.) Because of the denials by the Defendants of the alleged Forged Signature Commissions, the Court called on the Probation Officer and the victim's representative to

10

give testimony on this issue. Based on stipulated facts in the parties' Plea Agreements, and the entire testimony of the two witnesses at the evidentiary hearing, the Court overruled the Defendants' objections to the inclusion of the Forged Signature Commission in the total loss, and outlines the relevant facts from the witnesses' testimonies below.

1. *U.S. Probation Officer Jeff Ventura*

Because the United States could not call a witness regarding the Probation Officer's inclusion of the Forged Signature Commissions in the total loss amount because of its obligations from Defendants' plea agreements, the Court called U.S. Probation Officer Jeff Ventura to testify. (*Id.* at 94.)

Officer Ventura testified that ABC created the charts of both Joshua's Commissions and the Forged Signature Commissions. (*Id.* at 99.) Officer Ventura reviewed each entry by matching the entry with the receipt from ABC. (*Id.* at 99, 116.) He omitted ones that were not legible. (*Id.* at 99-100.)

On cross-examination, Attorney Razzano questioned Officer Ventura if he independently verified the information provided by ABC. (*Id.* at 110-11.) Officer Ventura confirmed that he did not contact Toshi Ito or Reed Hayes himself, who were hired by ABC to assist ABC in the investigation into the suspected fraudulent activity of the Defendants. (*Id.* at 111.) Officer Ventura also confirmed that no FBI investigator gathered the information. (*Id.*) Attorney Razzano asked Officer Ventura where an ISA would go to receive their money. (*Id.* at 112.) Officer Ventura responded he believed it was Luella and Saori. (*Id.*) Attorney Razzano then asked Officer Ventura "[i]f I was to tell you that that's not correct, that the actual procedure is they approve the transaction, and then I have to go and get the money from a separate cashier, would that surprise you?" (*Id.*)

11

Then Attorney Razzano asked Officer Ventura that he knows neither Luella nor Saori worked at the cashier. (*Id.* at 113.)[2]

Despite Attorney Razzano's earlier concerns regarding why the Probation Officer added the total amount to Defendants PSRs, he asked no questions regarding this issue. Attorney McDonald for Joshua asked Officer Ventura what caused him to add the paragraph of Forged Signature Commissions to Joshua's PSR, to which Officer Ventura explained his thought process for adding in the Forged Signature Commissions to Joshua's PSR. (*Id.* at 132-33.) After Attorney Razzano and McDonald finished their cross-examinations, the Court dismissed Officer Ventura. (*Id.* at 134.)

2. *Steven Kasperbauer Testimony on Behalf of ABC*

Steven Kasperbauer is the owner of ABC. Mr. Kasperbauer took the stand and informed the Court "the questions that were directed to Mr. Ventura were questions that could be answered by the Secret Service because they helped us with the investigation in the very beginning." (*Id.* at 138.)

Mr. Kasperbauer informed the Court that the Secret Service investigated through calling the independent agents that would get commissions and some said that it was not their signatures. (*Id.* at 153.)

On cross-examination, Mr. Kasperbauer also stated that Luella was a cashier at some point and that both Luella and Saori would handle money. (*Id.* at 179.) After Attorney Razzano was done with cross-examination, the Court informed Defendants' attorneys that the Court would look at the binders that Mr. Kasperbauer referenced throughout his testimony and gave Defendants' attorneys the opportunity to review the binder and report back to the Court whether they received such binder and documents in discovery. (*Id.* at 189-90.) After taking a recess, the United States represented, on

---

[2] Attorney Razzano pursued this line of questioning regarding how ISAs were paid out despite Luella's Final Amended PSR stating "[a] review of surveillance video revealed Saori taking cash to pay Joshua the commission while Luella watching and approved the payout of the commission." (Luella Am. Final PSR ¶ 28.) Luella made no objections to this paragraph despite Attorney Razzano's line of questioning during cross-examination. (Tr. 131.)

behalf of all parties that they would prefer that probation provide the bates stamp material and other records that were provided in discovery. (*Id.* at 190.) The United States further explained, "I think what we envisioned was probation was free to provide everything that they have, in terms of discovery to the Court." (*Id.*) The only objection made by Defendants' attorneys was if the Court were to review the thumb drives included in the binders as they were not able to review those, but there was no objection to the Court reviewing the binders or the videos provided by U.S. Probation. (*Id.* at 200-01.)

The Court addressed Attorney Razzano about his representation that no law enforcement had been involved. (*Id.* at 202.) He stated he "saw one Secret Service report from April of 2019. That's why I stood up and I said what is this about. And he said well, Joe, maybe there's 2 or 3 or 4 more reports but I never seen a report that had any number in it or really any investigation whatsoever. So I standby what I said." (*Id.*) The Court inquired if Attorney Razzano expected to bring any witnesses forward on behalf of their clients and he stated no. (*Id.* at 204.)

3. *The Court's Ruling on Objections to the Inclusion of the Forged Signature Commissions in Defendants Guideline Calculations for Loss*

Sentencing resumed the next day, at which time the Probation Officer orally amended the Defendants' PSRs to reduce the Forged Signature Commissions amount by $192.50 because of the exclusion of five entry tour dates. (*Id.* at 219.) Additionally, the Probation Officer amended Saori's Final Amended PSR to exclude any loss amount that occurred prior to her entering the conspiracy. (*Id.* at 221.) This reduced Saori's amounts of Forged Signature Commissions to $148,466.85 and Joshua's Commissions to $13,2019. (*Id.*)

The Court informed the parties that during the overnight recess, the Court had the Probation Officer match the documents provided in the binder to that in discovery that was provided to all Defendants. (*Id.* at 226.) The Court took into evidence the two binders that Mr. Kasperbauer provided—one black and one white. (*Id.*) The white binder, labeled "Fukuhi" was matched with bate

13

stamp Number 1 through 82. (*Id*. at 227.) During the recess, the Court reviewed the following documents from discovery.

The U.S. Secret Service ("USSS") Report, Base Stamp No. 14,366 to 14,409 focused on Task Force Officer ("TFO") C.P. Calvo's interview of ISA Ryo T. Saso ("Saso"). (*Id*. at 228.) Saso was an ISA for ABC between 2017 to 2019. It was reported that when Saso reviewed the commission paid out receipt posted by Saori with his name on it, he indicated that his signature appeared to have been forged and the printed handwriting did not appear to be his. He also did not recognize the contact information on the receipt. He also did not remember being paid a commission during that timeframe as indicated on the commission paid out receipt. Saso is listed as an ISA in multiple entries in the PSR paragraph regarding the Forged Signature Commissions, such as at voucher numbers 304383, 304167, 304129, 304183.

In the same USSS Report, TFO Calvo detailed his interview of ISA Patria Jel G. Cunanan ("Cunanan"). Cunanan was an ISA for ABC between 2016 to 2019. Cunanan indicated when reviewing a receipt from ABC that numerous signatures between 2017-2019 appeared to have been forged. She also did not remember receiving payments on the forms specifying "See Attachment." The Attachment referred to a detailed printout of the services, which she did not recall ever signing and further indicated that the signatures appeared to have been forged. She further noted that there were numerous receipts with her name misspelled and inconsistencies with how she normally would fill it out. Cunanan is also listed as an ISA in multiple entries in the PSR paragraph regarding Forged Signature Commissions, such as at voucher numbers 360636, 360630, 360602A, 360626 .

Evidence with Bates Stamp No. 1,866 to 1,947 contains camera footage of Luella and Saori looking through ISA candidates and copies of their identifications. In particular, the footage from inside ABC shows Saori pulling out Abigail Ramos Sahagun's copy of her identification. Luella and Saori altered the ABC receipts in order to receive payouts for commissions for reservation Fukui.

14

Originally, on January 7, 2019, the ISA was listed as unknown, but the reservation shows that on January 8, 2019, Luella altered the reservation to list the ISA as Abigail Ramos Sahagun. Thereafter, Luella changed the name of the ISA to Joshua's. This demonstrated Luella and Soari's process in which they used their binder of ISA agents and altered the bookings, which corroborates Mr. Kasperbaurer's testimony.

The Court concluded that the Secret Service Reports identifying ISA agents who confirmed their signatures were forged and whose vouchers are contained in the spreadsheet in Defendants' Amended Final PSRs for Forged Signature Commissions in combination with the pictures of the video footage of Luella and Soari constituted sufficient evidence supporting by more than a preponderance of evidence, the loss claim stated in in the Forged Signature Commissions in all three Defendants' Amended Final PSRs. (*Id.* at 234.) Upon resolving this factual issue, the Court calculated the Defendants applicable guidelines ranges. (*Id.* at 234.) The Court calculated Luella's Total Offense Level to be 17 given that she receives a ten-level increase for specific offense characteristic under USSG § 2B1.1(b)(F).

## II.  LEGAL STANDARD

Title 18, U.S. Code § 3143(b) states that a defendant be detained pending an appeal unless the Court finds (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community"; (2) the "appeal is not for the purpose of delay"; and (3) the appeal "raises a substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." It is the third requirement that is at issue here, which Luella has the burden of establishing. *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).

15

### III.    ANALYSIS

Luella presents three challenges in view of 18 U.S.C. § 3143(b) and *Handy*. Luella argues that she raises a substantial question of law and fact because her due process rights were violated in two instances: when the Court took on the role of prosecutor in the case and when the Court failed to provide adequate notice under the Fifth Amendment of the U.S. Constitution and Federal Rules of Evidence 32(h) "regarding the shift." (Mot. 7.) Next, Luella argues that the probable accuracy of the loss amount for purposes of determining the specific offense characteristic is not supported by reliable evidence. (*Id.* at 11.)

### A. The Court did not violate Luella's due process rights by calling and questioning witnesses at sentencing.

Luella contends that I, the undersigned judge, prejudged the case against her based on the Probation Officer orally amending Defendants' PSRs and by ordering that the amended PSRs be filed.[3] (Mot. 8-9.) Luella further contends I was prejudiced as shown from the evidentiary hearing in which I assumed "the role of the prosecutor." (*Id.* at 9.) Luella further argues that even after Attorney Razzano conducted cross-examination, this Judge "conducted redirect to rehabilitate her witness and elicit further testimony to support of the Court's predetermined loss calculation." (*Id.*) The Court finds that given Ninth Circuit case law regarding the Courts' role at sentencing, the rules of evidence that permit the court to call and question witnesses, the Court did not violate Luella's due process rights and therefore Luella does not raise a substantial question of law likely to result in reversal.

Under Ninth Circuit precedent, this Court had the authority to call and examine witnesses at the sentencing hearing. Under the Federal Rules of Evidence, "[t]he court may, on its own motion . . . , call witnesses, and all parties are entitled to cross-examine witnesses thus called." Fed. R. Evid.

---

[3] This Court ordered that Defendants Amended PSRs be filed at the request of Mr. Razzano. (Tr. 60, 68-69.)

614(a). "The court may also 'interrogate witnesses, whether called by itself or by a party.'" *United States v. Alfaro*, 336 F.3d 876, 883 (9th Cir. 2003) (quoting Fed. R. Evid. 614(b)). However, a judge's discretion is not arbitrary or uncontrolled; rather, due process requires that the judge remain impartial and disinterested. *Id.* (citations omitted). "[F]or instance, '[h]e may analyze and dissect the evidence but he may not either distort it or add to it.'" *Id.* (quoting *Quercia v. United States*, 289 U.S. 466, 470 (1933)).

In *United States v. Alfaro*, the Ninth Circuit found that a judge who called and examined a witness during sentencing did not abdicate his judicial role. *Id.* In *Alfaro*, the district court requested that a Drug Enforcement Agent chemist testify at sentencing about the manufacturing of methamphetamine. *Id.* at 878. The court at sentencing examined the witness and allowed for cross examination by the defendant's counsel. *Id.* On appeal, the petitioner argued that the judge abdicated his judicial role, but the Ninth Circuit held that the petitioner failed to show that the judge was partial or interested. *Id.* at 883. The petitioner complained of the judge finding the witness credible but did not allege that the judge distorted or added to the evidence. *Id.* Moreover, the petitioner did not challenge the substantive aspects of the witness' testimony. *Id.*

Similarly, here, Luella does not contest the validity of the Secret Service Reports, which this Judge relied on, in part, in determining the reliability of evidence to support the loss amount. Mr. Razzano only indicated he was aware of one Secret Service Report provided in discovery, but there were in fact several. Moreover, he represented to this Court that there was no independent review of the Forged Signature Commissions, which is directly contradicted by the Secret Service Reports. Regardless of Mr. Razzano's ignorance to the particular USSS Reports provided in discovery, he did not object to the Court reviewing the evidence with the Probation Officer that was provided to all in discovery and actually affirmatively stated it did not have any issues with such reviewal. (Tr. 200-01.) Rather, Luella argues that I stepped into the role of the prosecutor and complains of my

17

"accepting in full the testimony of the witnesses it called." (Mot. 3.) In essence, Luella complains of my finding the witnesses credible—which the Court only did so upon reviewing the evidence provided in discovery that corroborated his statements—just as the petitioner did in *Alfaro*.

The procedure of the Court calling a witness and questioning them at sentencing to determine the applicable guidelines is also supported by *United States v. Allen*. 434 F.3d 1166, 1176 (9th Cir. 2006). In *Allen*, the petitioner argued that the government breached its plea agreement when it found a witness who provided information supporting an enhancement under the applicable guidelines "as requested by the district court and questioned that witness." *Id.* at 1174. The district court, aware of the prosecutor's dilemma of being bound by the plea agreement, tried to take over some of the questioning "to take the onus off [the prosecutor]." *Id.* at 1176. The district court therefore asked questions that clarified what the investigation revealed. *Id.* The Ninth Circuit indicated that where the district court feels it necessary to receive testimony in support of a sentence different from the one the prosecutor has agreed to recommend, the court "should ordinarily conduct the questioning themselves." *Id.*

Because this Court has the authority to call and examine witnesses pursuant to *Alfaro* and followed the "preferable procedure" under *Allen*, and Luella does not contend I distorted or added to the evidence, I find that I did not impermissibly step into the role of prosecutor. Further, this Court did not redirect either Officer Ventura or Mr. Kasperbaurer as contended by Mr. Razzano in Luella's Motion. The only questions the Court asked after cross-examination were to illicit how the Court was to receive the evidence referenced by Mr. Kasperbauer into the record—which Luella did not object to.

Moreover, the case law Luella relies on for her Motion is not on point or applied correctly to the facts of this case. First, Luella cites to *United States v. Karnes*, 531 F.2d 214, 216-17 (4th Cir. 1978). Not only is *Karnes* non-binding authority in this district, but the case pertains to the court

calling a witness *during* trial. *Karnes*, 531 F.2d at 216. Luella cites to the quote "This impartiality is destroyed when the court assumes the role of prosecutor and undertakes to produce evidence . . . which the government has declined to present." (Mot. 8 (quoting *id.*).) In quoting this, Luella leaves out a pertinent part of the quote which states that the evidence must be "essential to overcome the defendant's presumption of innocence." *Karnes*, 531 F.2d at 216. Luella also ignores other relevant case law cited within *Karnes* in which the court called a witness who gave unfavorable testimony to the defendant but was sustained on appeal. *Id.* (citing to *United States v. Wilson*, 361 F.2d 134 (7th Cir. 1996) and *Smith v. United States*, 331 F.2d 265 (8th Cir. 1964)). At a minimum, Luella improperly applies *Karnes*, but more egregiously, Luella appears to misrepresent the application of *Karnes* through purposeful omissions in her Motion.

Again, in the Ninth Circuit case Luella cites, *United States v. Pena-Garcia*, the court examined a witness *during* trial, and moreover, "[t]he judge interrupted and continued to interrogate, cross-examine, threaten and intimidate the witness and to threaten defense counsel with contempt." 505 F.2d 964, 965 (9th Cir. 1974). This is not the case before the Court, nor does Luella argue that this Court threatened or intimidated the witness or defense counsel. Luella's "cherry-picking" of one-line sentences taken out of context of the cases which she cites, or through direct omissions, is worrisome.

For these reasons, the Court concludes it did not violate Luella, or any of the Defendants' due process rights when it called the two witnesses and asked questions to determine the appropriate sentencing guidelines calculations.

### B. The Court did not fail to provide notice (or rather was not required to provide notice)

Luella also argues that this Court did not provide adequate notice mandated by the Due Process Clause of the Fifth Amendment of the U.S. Constitution and Federal Rule of Criminal Procedure 32(h). (Mot. 9.)

19

First, the Court does not find that its "failure to provide notice" and Luella's appeal of such alleged failure raises a substantial question of law or fact likely to result in reversal. Mr. Razzano on behalf of Luella never objected to the Court proceeding with an evidentiary hearing regarding the contested Forged Signature Commissions. The Ninth Circuit notes that as a general rule, the Ninth Circuit will not consider arguments that are raised for the first time on appeal. *See Francis v. Galaza*, 308 Fed. Appx. 108, 110 (9th Cir. 2009); *see also Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

Second, Luella cites to Federal Rule of Criminal Procedure 32(h) in support of her argument, but this is inapplicable because the Court did not depart from the applicable sentencing range as to Luella.

Rule 32(h) states:

> Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure.

At the hearing on Luella's Motion, she contended that the policy underpinning Rule 32(h) should apply to the Court conducting the evidentiary hearing to determine the total loss amount. Luella also attempted to distinguish the procedures the Ninth Circuit deemed appropriate in *Alfaro* and *Allen* from this case as to the issue of notice by asserting that unlike in *Allen* and *Alfaro*, the defendants in those cases entered sentencing knowing that there was a different application of the sentencing guidelines unlike here where the Defendants, the United States, and Probation Officer were all in agreement.

However, here, the Court did provide defense counsel the opportunity to object to the Amended Final PSRs by continuing the sentencing on September 6, 2024. Defendants entered the continued sentencing hearing on September 18, 2024, knowing that there was a difference in

20

application of the applicable sentencing guidelines just as in *Allen* and *Alfaro*. Moreover, Luella was unable to cite to any authority to support the application of Rule 32(h) to non-departures. For these reasons, the Court finds that it did not fail to provide notice to Luella or any other Defendant and this cannot serve as a basis for Luella's release pending appeal.

### C. The Court's factual finding to support the loss calculation is supported by reliable evidence and is not "clearly erroneous."

Finally, Luella argues that this Court abused its discretion when its application was illogical, implausible, or without support in inferences from the facts in the record. (Mot. 10-11.) Specifically, Luella argues that no witness testified about a definitive amount of loss or where the monies went or if they were missing at all. (*Id.* at 11.) Luella takes issue with both Officer Ventura's and Mr. Kasperbauer's testimony and questions the accuracy or reliability of the information provided by the victim. (*Id.* at 11.)

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also United States v. Crook*, 9 F.3d 1422, 1427 (9th Cir. 1993).

Defendants' plea agreements' terms, including the loss amount, do not bind the Court and is only binding to the U.S. Attorney's Office for the Districts of Guam and the NMI. (Luella Am. Plea Agreement ¶ 21.) Therefore, Luella entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B) (recommendation or request does not bind the court), and not Rule 11(c)(1)(C) (recommendation or request binds the court once the court accepts the plea agreement). Furthermore, the Court is not bound by the loss amount stipulated to by the parties. U.S.S.G. § 6B1.4 states, "[t]he court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing."

In determining the total loss calculation, the Court first started with Luella and Defendants' plea agreements. Luella's plea agreement states, "[i]n situations where customers booked tours or activities with ABC using the website, over the phone, or in-person, [Luella] and Saori would use their knowledge of and access to ABC's computer reservation system to add Joshua **or another ISA as the referring agent.**" (Luella Am. Plea Agreement ¶ 5 (emphasis added).) "In cases where [Luella] and Saori **fraudulently entered another ISA's name as the referring agent**, a photocopy of the ISA's identification was used, which included Guam driver's licenses, United States Passports, and other identification documents, the ISA's signature was forged, and a false cash receipt was created for the commission." (*Id.*) "Then, [Luella], Saori, and Joshua would share the cash proceeds." (*Id.*) Luella's Amended Plea Agreement, explicitly states that not only was Joshua's name used in Defendants' conspiracy to commit fraud, but other ISA's names and identification were used, outlining two separate schemes. Further, Luella's Amended Plea Agreement states that they would share the cash proceeds from such fraudulent activities. These stipulated facts serve as the factual basis that Luella and her co-conspirators engaged in fraudulent activity regarding the use of Joshua's name, but also other ISA agents which they would share the proceeds from.

Next, in determining the scope of the fraudulent commissions from ISAs other than Joshua, the Court heard testimony from Officer Ventura and Mr. Kasperbauer. Officer Ventura testified that he matched each ABC receipt with the corresponding entry in the Forged Signature Commissions table. Mr. Kasperbauer testified that the Secret Service conducted an investigation into the conspiracy involved in this case, which was not only confirmed by the Secret Service Reports, but the Secret Service Reports identified ISA agents listed in the Forged Signature Commissions list. The ISA interviewed by the Secret Service confirmed that their signatures were forged and that they do not recall receiving the commissions from such transactions. The Secret Service Reports corroborated Mr. Kasperbauer's testimony. For these reasons, and given the totality of the evidence

the Court considered, the Court found that the evidence supported the total loss calculation to include the Forged Signature Commissions by more than a preponderance of evidence. The Court does not find that it clearly erred and therefore, Luella's argument does not raise a substantial question of law or fact likely to result in reversal.

**IV.     CONCLUSION**

The Court does not find that any of Luella's reasons for appeal raise a substantial question of law or fact likely to result in reversal. As such, the Court denied Luella's Motion for Release Pending Appeal.

IT IS SO ORDERED this 20th day of November 2024.

_____
RAMONA V. MANGLONA
Designated Judge